Case 8:20-bk-03563-RCT   Doc 202-2   Filed 05/10/21   Page 1 of 12
Case 8:20-bk-03563-RCT   Doc 161-2   Filed 12/03/20   Page 1 of 12
Case 8:20-bk-03563-RCT   Doc 160-2   Filed 12/02/20   Page 1 of 12

# In The Matter Of:

*Gardenmasters of SW Florida, Inc. v.*
*Performance Driven Landscaping Corp.*

---

*Joy DeGrasse*
*April 16, 2020*

---



## IMPERIAL
### —COURT REPORTING—

P: (941) 260-9000     F: (941) 296-7017
Toll-Free: 1 (844) NO-TYPOS
E: admin@imperialcourtreporting.com
W: www.imperialcourtreporting.com

**YOUR LOCAL SARASOTA - BRADENTON**
**COURT REPORTERS & VIDEOGRAPHERS**

*Min-U-Scripts*



Case 8:20-bk-03563-RCT   Doc 202-2   Filed 05/10/21   Page 2 of 12
Case 8:20-bk-03563-RCT   Doc 161-2   Filed 12/03/20   Page 2 of 12
Case 8:20-bk-03563-RCT   Doc 160-2   Filed 12/02/20   Page 2 of 12

Gardenmasters of SW Florida, Inc. v.
Performance Driven Landscaping Corp.

Joy DeGrasse
April 16, 2020

## Page 1

```
 1      IN THE CIRCUIT COURT OF THE TWELFTH
        JUDICIAL CIRCUIT OF THE STATE OF FLORIDA
 2      IN AND FOR SARASOTA COUNTY, FLORIDA
 3           Case No. 2018 CA 6432 NC
 4
 5  GARDENMASTERS OF SW FLORIDA, INC.,
 6           Plaintiff,
 7  vs.
 8  PERFORMANCE DRIVEN LANDSCAPING CORP.,
 9           Defendant.
                                         x
10  ─────────────────────────────
11
12       VIDEO TELECONFERENCE DEPOSITION OF
13                  JOY DEGRASSE
14       TAKEN ON BEHALF OF THE PLAINTIFF
15
16  DATE:   April 16, 2020
17  TIME:   2:50 p.m. - 3:50 p.m.
18  PLACE:  Performance Driven Landscape
            8740 Fruitville Road
19          Sarasota, FL 34240
20
21
22
23  EXAMINATION OF THE WITNESS TAKEN BEFORE:
24  JENNIFER D. DILORENZO, COURT REPORTER
25
```

## Page 2

```
 1           APPEARANCES OF COUNSEL
 2
 3       APPEARANCE FOR THE PLAINTIFF
            BY VIDEO TELECONFERENCE
 4
     Charles F. Johnson, Esq.
 5   Blalock Walters, P.A.
     802 11th Street West
 6   Bradenton, FL 34205
     941-748-0100
 7   cjohnson@blalockwalters.com
 8       APPEARANCE FOR THE DEFENDANT
            BY VIDEO TELECONFERENCE
 9
     Michael A. France, P.A.
10   1515 Ringling Boulevard
            Suite 800
11   Sarasota, FL 34236
     941-953-3600
12   eservice@mfrancelaw.com
13
              ALSO PRESENT
14       BY VIDEO TELECONFERENCE
15  Michael Juchnowicz, Plaintiff Representative
16              * * * *
17
                  INDEX
18
19  Deposition of JOY DEGRASSE          Page No.
20  Direct Examination by Mr. Johnson       4
21  Certificate of Oath                    39
22  Certificate of Reporter                40
23  Errata sheet                           41
24  Read letter                            42
25              * * * *
```

## Page 3

```
 1            PLAINTIFF'S EXHIBITS
 2  NO.   DESCRIPTION                          PAGE
 3   2    Answers to Second Amended Complaint   32
 4   4    November 1, 2018 letter from Michael
          Juchnowicz to PDL                     18
 5
     5    November 5, 2018 letter to Michael
 6        Juchnowicz from Michael France        32
 7   6    November 6, 2018 letter to Brian
          Rivenbark from Michael Juchnowicz     34
 8
     9    Estimates                             35
 9
    10    Estimates                             35
10
    12    Answers to Second Set of
11        Interrogatories                       23
12  13    Defendant's Notice of Service of
          Answers to Trial Interrogatories      26
13
    14    Defendant's Notice of Service of
14        Answers to Interrogatories            29
15  16    Invoices                              20
16  18    CLC Lab results                       27
17
                   * * * *
```

## Page 4

```
 1       THE REPORTER: Do you swear or affirm the
 2   testimony you're about to give will be the
 3   truth, the whole truth, and nothing but the
 4   truth?
 5       THE WITNESS: Yes, ma'am.
 6   ──────────
 7  Whereupon,
 8       JOY DEGRASSE, acknowledged having been duly
 9   sworn to tell the truth and testified upon her oath as
10   follows:
11           DIRECT EXAMINATION
12  BY MR. JOHNSON:
13   Q.  Could you please state your full name for the
14   record?
15   A.  Joy Nicole DeGrasse.
16   Q.  What is your business address, Ms. DeGrasse?
17   A.  7840 Fruitville Road.
18   Q.  What is your residence address?
19   A.  2727 Dick Wilson, Sarasota.
20   Q.  What is your job title at Performance Driven
21   Landscape Corporation?
22   A.  President.
23   Q.  If I just call Performance Driven Landscape
24   Corporation "PDL," will you know what I'm talking about
25   today?
```

Case 8:20-bk-03563-RCT   Doc 202-2   Filed 05/10/21   Page 3 of 12
Case 8:20-bk-03563-RCT   Doc 161-2   Filed 12/03/20   Page 3 of 12
Case 8:20-bk-03563-RCT   Doc 160-2   Filed 12/02/20   Page 3 of 12

Gardenmasters of SW Florida, Inc. v.                          Joy DeGrasse
Performance Driven Landscaping Corp.                         April 16, 2020

Page 5

1  A. Yes, sir.
2  Q. What are your job responsibilities as
3  president of PDL?
4  A. Geez. I oversee -- I just basically
5  oversee everything.
6  Q. What is your job responsibility as president
7  of PDL vis-a-vie the Gardenmasters account?
8  A. That's kind of a tough question. At the
9  time when we -- when -- at the time when they were --
10 I wasn't even in the office, so I didn't work in the
11 office for two and a half years. So my title was
12 president, but I wasn't a working president. I was
13 an at-home president.
14 Q. What was the period of time when you were the
15 out-of-office president as distinguished from being in
16 the office?
17 A. From 2000 -- end of '16 until just two
18 months ago.
19 Q. For the period from the end of 2016 until
20 approximately February 2020, what actions were you taking
21 as president? Or do I correctly understand that your
22 husband, John DeGrasse, was really running the company?
23 A. John was really running the company. When
24 it came to admin, if there was any big decisions or
25 questions, people would call me to run things by me,

Page 6

1  but that was pretty much it. I was very minimal --
2  minimally involved, unless I was called in for an AQR
3  problem.
4  Q. From the end of 2016 until approximately
5  February of 2020, how many hours a week were you working
6  for PDL?
7  A. Oh. I mean, hard number. Maybe an hour
8  here, an hour there a day.
9  Q. I'm trying to make this sound like I'm not
10 putting a negative spin on it. But my description is
11 that you were an absentee president from the end of 2016
12 until approximately February 2020. Is that fair to say?
13 A. Yes.
14 Q. And during the period that you were the
15 absentee president, your husband, John DeGrasse, was
16 running the company and performing all of the functions
17 as the president except for an hour here or an hour there
18 for you?
19 A. Correct. He ran the field and then we had
20 hired staff to run the admin.
21 Q. And except for an hour here or an hour there,
22 somebody else ran the admin rather than you?
23 A. Correct. Yes.
24 Q. If the answer to this question elicits
25 personal information, I want you to tell me that rather

Page 7

1  than answering it. If the answer is as simple as, "I was
2  staying home to raise children," I'd like you to answer
3  the question.
4       So my question is: For the period from the
5  end of 2016 until approximately February 2020, why were
6  you an absentee president?
7  A. It was a mixture of I have -- I have a
8  troubled son at home, was number one, and I was going
9  through some family issue.
10 Q. What caused you to resume being the president
11 in February 2020?
12 A. Oh. That's very personal. I had to
13 come --
14 Q. I withdraw the question.
15 A. Very personal. Okay. Thank you.
16 Q. Could you tell me in a big picture way your
17 educational background, Ms. DeGrasse?
18 A. Banking. My background was in banking.
19 As far as education, high school; and then I went to,
20 you know, trade school to be a mortgage broker; and
21 then I took three years of psychology.
22 Q. Where did you take three years of psychology?
23 A. At Edison Community College. I dropped
24 out my third year and continued the path of life
25 coaching versus counseling because I liked to focus

Page 8

1  on the future, and not on the past.
2  Q. Do you have any training in the area of soil
3  science or chemistry?
4  A. No. No. No formal training at all, sir.
5  Q. I was looking and I saw a company that was
6  formed not too long ago called Performance Driven Tree
7  and Landscape. What is that?
8  A. It's actually going to be dissolved. We
9  were in the process of trying to get an SBA for a
10 tree service -- to buy a tree service. It was in
11 addition to what we have now to offset our summer
12 profitability because we're losing a lot of money, so
13 we thought that would be the answer to that problem.
14      However, after the SBA and due diligence,
15 the company wasn't going to be profitable.
16 Therefore, it was going to have a negative impact on
17 us, so we backed out of that. So we -- but we had to
18 do the corp. for that purpose.
19 Q. Besides your driver license, do you hold any
20 licenses?
21 A. No.
22 Q. Do you hold yourself out as an expert in
23 landscaping?
24 A. I'm not an expert at anything. I'm not.
25 I'm not. I admit it. No. I'm not an expert at

Case 8:20-bk-03563-RCT    Doc 202-2    Filed 05/10/21    Page 4 of 12
Case 8:20-bk-03563-RCT    Doc 161-2    Filed 12/03/20    Page 4 of 12
Case 8:20-bk-03563-RCT    Doc 160-2    Filed 12/02/20    Page 4 of 12

Gardenmasters of SW Florida, Inc. v.  
Performance Driven Landscaping Corp.

Joy DeGrasse  
April 16, 2020

**Page 9**

1 landscaping.
2  Q.  During the period when you have been an active
3 president of PDL, what was your role, if any, regarding
4 accounting?
5  A.  Overseeing the accountant. That was it.
6 I do not -- I am not -- I do not have an accounting
7 background. I mean, however, I have a banking
8 background, so I pretty much just over- -- would
9 oversee what they do making sure they were making
10 proper decisions. That's about it.
11  Q.  Have you reviewed the Gardenmasters' account
12 with PDL?
13  A.  Yes, I have.
14  Q.  What, if any, conclusions did you draw as a
15 result of your review of the Gardenmasters' account with
16 PDL?
17  A.  The Gardenmasters' account was first
18 brought to my attention by staff members, and that's
19 why the soil samples were actually pulled. I ordered
20 them because the employee that we had -- we were -- I
21 was noticing we were spending a lot of extra money,
22 and I had the accountant that worked for us at the
23 time was telling me that she was seeing a lot of
24 money going out.
25      We were having -- spending a lot of money

**Page 10**

1 with a lot of replacements and that she believed, her
2 opinion at the time, was that the end -- the opinion
3 of, actually, Josh Ward was that the -- we weren't
4 getting the fertilizer that we should.
5      So I said, "Well, I don't want to make an
6 accusation," so that's kind of where it started. So
7 I'm the one that ordered a soil sample because I'm
8 not going to make an accusation based on hearsay. I
9 wanted the facts, so that's why I requested the soil
10 sample to be pulled.
11  Q.  Approximately how long before the soil samples
12 -- when were the soil samples taken in relation to when
13 the CLC testing reports were completed?
14  A.  They -- they were taken and we got the
15 results pretty quickly. They -- all the soil samples
16 were taken over a week and a half period of time on
17 every property, and then they were sent. And the
18 reports came back pretty quickly. I couldn't give
19 you an exact timing because I don't -- it's been so
20 long ago I don't remember, but it was within a few
21 weeks.
22  Q.  So if the soil samples are dated August 24th,
23 you think you probably took the actual samples in the
24 month of August?
25  A.  I would -- that would make sense. Yes.

**Page 11**

1  Q.  Approximately, how far in advance of the
2 samples being taken was the Gardenmasters account brought
3 to your attention?
4  A.  Okay. Sorry. Before --
5  Q.  The way I -- Ms. DeGrasse, the way I
6 understand the sequence is that somebody brought the
7 Gardenmasters account to your attention. It caused you a
8 concern. Therefore, you took the samples which resulted
9 in the CLC testing data; is that correct?
10  A.  Yes.
11  Q.  If I represent to you that these CLC testing
12 data is dated August 24th of the year 2018, approximately
13 when was the Gardenmasters account brought to your
14 attention?
15  A.  It was brought to my attention before the
16 soil samples were taken.
17  Q.  And based on the date of August 24th being the
18 CLC test results, can you estimate that it was July 1st
19 or July 15th or --
20  A.  It was ongoing. It was ongoing for quite
21 a while where I was -- I was being told a little bit
22 of information here and there. I mean, over probably
23 six or seven months timeframe. And I would talk to
24 John DeGrasse about it and say, "What" -- and he --
25 actually, in Mike J.'s defense -- he was always

**Page 12**

1 defending Mike J. -- and he would say, "There's, you
2 know, no way that we're that, you know, deficient,"
3 and he would defend him, and that was the reason why
4 I pulled the soil samples.
5      I'm, like, something's not right.
6 Something's not right. So that's why we decided to
7 pull the soil samples.
8      As for the soil samples being part of this
9 lawsuit at this point, it's actually kind of
10 irrelevant because we're not seeking claims on the
11 fact that we were 60 percent deficient on every
12 property. We're not even seeking claims for that.
13  Q.  Do I correctly understand from your statement
14 that you're not seeking monetary damages from
15 Gardenmasters as a result of the deficiencies in any of
16 the fertilizer or other chemicals that were applied by
17 Gardenmasters?
18  A.  Yeah. I guess, if you word it that way,
19 then, yeah. You're right. We are. Because it did
20 lead to loss of property. It led to the loss of sod.
21 So, yes, we are. So I stand correct there. Thank
22 you.
23  Q.  And I'm generally aware that your lawyer has
24 provided me with a list of sod, which is $47,375. Have
25 you seen that list?

Case 8:20-bk-03563-RCT   Doc 202-2   Filed 05/10/21   Page 5 of 12
Case 8:20-bk-03563-RCT   Doc 161-2   Filed 12/03/20   Page 5 of 12
Case 8:20-bk-03563-RCT   Doc 160-2   Filed 12/02/20   Page 5 of 12

Gardenmasters of SW Florida, Inc. v.
Performance Driven Landscaping Corp.

Joy DeGrasse
April 16, 2020

**Page 13**

1  A. Yes, and that's correct.
2  Q. Do I correctly understand that PDL is seeking
3  $47,375 from Gardenmasters as a result of Gardenmasters'
4  failure to perform the services that were requested by
5  PDL?
6  A. Correct. Which resulted in dead turf that
7  we had to replace. Correct.
8  Q. Besides the $47,375 for the replacement of
9  sod, what, if any, additional damages or claims is PDL
10 making against Gardenmasters"?
11 A. With all the evidence that I gathered up
12 from all of our bookkeeping and all the emails and
13 complaints over a year's period of time, we are
14 seeking additional damages of $80,000 for loss of
15 business that was due to a combination of things
16 being turf, plants, deficiency in turf, not green --
17 you know, not green grass. So, $80,000.
18 Q. Who was it that first brought the
19 Gardenmasters account to your attention?
20 A. Nicole Vander Clay.
21 Q. And I think earlier I asked, but I'm not sure
22 I got a clear answer to my question, if the CLC testing
23 data is dated August 24, 2018, are you able to estimate
24 by month and year when the Gardenmasters account was
25 brought to your attention?

**Page 14**

1  A. I can -- I can only estimate without going
2  back to emails, so I don't want to give you an
3  incorrect answer, but it would have been way before
4  that. So we're --
5  Q. When you say, "way before," do you mean spring
6  of 2018? Spring of 2017? I don't mean to sound
7  sarcastic with you. I'm just trying to figure out if
8  it's 3 months or 6 months or 12 months.
9  A. No. I would say over six months -- six
10 months.
11 Q. Would it be fair for me to understand that it
12 was approximately in the spring of 2018 when you became
13 concerned about the Gardenmasters account?
14 A. That's fair to say, but I could go back if
15 you need me to or my attorney needs me to. I can go
16 back and actually go back through all my emails and
17 find the exact date when the problem started.
18 Q. A few moments ago you said that PDL was
19 asserting a claim for $80,000 against Gardenmasters in
20 addition to the $47,375 for sod, correct?
21 A. Correct. We're requesting an offset.
22 Correct.
23 Q. And could you please describe for me the
24 specific factual basis for the $80,000 claim?
25 A. Loss of business.

**Page 15**

1  Q. What specific business was lost by PDL as a
2  result of the conduct of Gardenmasters?
3  A. I don't have that list right in front of
4  me, but I -- it has been provided, and I can get -- I
5  can get it for you, but I don't have that information
6  in front of me. I just have the numbers.
7  Q. What numbers do you have in front of you?
8  A. No. I just have the total number of
9  $80,000.
10      MR. JOHNSON: Mr. France, are you able to
11 provide me the backup or a calculation for the
12 $80,000 damages?
13      MR. FRANCE: Let me talk to her for a
14 second, if I may.
15      THE WITNESS: I don't know how to mute
16 you.
17      MR. JOHNSON: Thank you.
18      THE WITNESS: I'm not muting you. I'm
19 just going to walk away for a second.
20      (Discussion off the record.)
21      MR. FRANCE: I cannot provide you any
22 backup or a calculation.
23      MR. JOHNSON: Madam Court Reporter, was
24 that on the record?
25      THE REPORTER: Yes.

**Page 16**

1  BY MR. JOHNSON:
2  Q. Ms. DeGrasse, are you able to provide me the
3  specific names of any customers that were lost amounting
4  to the $80,000 of damages?
5  A. Sorry. I lost you for a second.
6  Q. I'll re-ask the question.
7     Are you able to provide me the specific names
8  of any customers that form the basis for the $80,000
9  claim?
10 A. I have given those names to Michael
11 France. I don't have them, and I don't have -- we
12 have so many customers. I can't keep track of the
13 names of them. So for me to give you right now off
14 the top of my head, I don't know -- I don't have
15 them.
16 Q. Are you able to provide me during this
17 deposition any mathematical calculation of how you
18 arrived at the $80,000 in damages?
19 A. No.
20 Q. What, if anything, is your involvement in the
21 outside part of the business; in other words, the
22 application of pesticides and fertilizer and the cutting
23 of grass?
24 A. (Witness shakes head.)
25 Q. You're shaking --

Case 8:20-bk-03563-RCT   Doc 202-2   Filed 05/10/21   Page 6 of 12
Case 8:20-bk-03563-RCT   Doc 161-2   Filed 12/03/20   Page 6 of 12
Case 8:20-bk-03563-RCT   Doc 160-2   Filed 12/02/20   Page 6 of 12

Gardenmasters of SW Florida, Inc. v.  
Performance Driven Landscaping Corp.

Joy DeGrasse  
April 16, 2020

### Page 17

1   A.   The first --
2   Q.   I think there was not.
3   A.   The first year, I picked weeds. Other
4   than that, nothing.
5   Q.   Am I correct --
6   A.   I do -- actually, I do go around in my car
7   and drive the properties and see if I notice anything
8   that -- I do go drive the properties, but it's
9   seldom. Very seldom.
10   Q.   At the risk of sounding sarcastic, Ms.
11   DeGrasse, is your knowledge similar to mine? In other
12   words, if you drive by and the grass is green, you're
13   doing a good job. If it's brown, you're doing a bad job?
14   A.   Exactly. If there's weeds, not good.
15   Q.   Right.
16   A.   If they're green weeds.
17   Q.   I understand. If the grass is dead, you're
18   not the one who tries to ascertain why it's dead?
19   A.   Correct. I just know it's not supposed to
20   be. Right. Shit. My yard's dead right now. My own
21   yard.
22   Q.   During the period of time that you were an
23   absentee president, what, if any, involvement did you
24   have in the work that was being done by Gardenmasters on
25   behalf of PDL?

### Page 18

1   A.   Zero.
2   Q.   Did you review the Gardenmasters accounts --
3   excuse me. During the time --
4   A.   I'm sorry.
5   Q.   During the time that you were an absentee
6   president, did you review the Gardenmasters invoices on a
7   weekly basis?
8   A.   No.
9   Q.   Do you know who would have been responsible at
10   PDL on a monthly basis for reviewing the Gardenmasters
11   invoices?
12   A.   Sara and Nicole Vander Clay.
13        MR. JOHNSON: Mr. France, could you grab
14   Exhibit 4 for me, please?
15        (Plaintiff's Exhibit 4 was identified for
16   the record.)
17   BY MR. JOHNSON:
18   Q.   Ms. DeGrasse, can you take a look at Exhibit 4
19   and let me know when you've had a chance to do so?
20   A.   I'm aware of this letter.
21   Q.   Did you see the November 1, 2018 letter that's
22   marked as Exhibit 4 when it was initially sent to PDL?
23   A.   Yes.
24   Q.   What, if anything, did you do upon your
25   receipt of Exhibit 4, which is a November 1, 2018 letter?

### Page 19

1   A.   The truth? Not told them, but we --
2        THE REPORTER: I'm sorry.
3        THE WITNESS: Hello?
4        THE REPORTER: You were muted at the
5   beginning of your answer.
6        THE WITNESS: Oh. Yeah. Now I don't see
7   anybody. It's just, like, ghosts.
8        THE REPORTER: We can see you, though.
9   A.   When we got it, I really didn't -- I -- I
10   didn't give a response, honestly. There was no
11   response. It was just -- there was no response.
12   Q.   Have you, since November 1, 2018, had the
13   opportunity to review the documents attached to
14   Exhibit 4, which is the November 1, 2018 letter?
15   A.   Have I review -- yes. I've reviewed them.
16   Q.   Have you identified any charges that are a
17   part of the attachments to Exhibit 4 that are overcharges
18   or otherwise inappropriate charges to PDL?
19   A.   No. I think that we did -- I think that
20   Nicole did a cleanup. I know at first we had a lot
21   of double entries, double invoice numbers, but I
22   believe that was corrected between Gardenmasters and
23   us with Nicole, so I believe this is accurate.
24   Q.   In other words, my understanding of the
25   position of PDL for purposes of this deposition and our

### Page 20

1   upcoming trial is that Gardenmasters has properly
2   invoiced $421,492.72 and that PDL is claiming an offset
3   for the sod of $47,375 and $80,000 for the loss of
4   business; is that correct?
5   A.   Correct. Yep. That's correct.
6   Q.   With regard to the sod, I believe that's
7   marked as Exhibit 16?
8        MR. JOHNSON: Mr. France, would you mind
9   handing --
10        THE WITNESS: Got it.
11        (Plaintiff's Exhibit 16 was identified for
12   the record.)
13        MR. JOHNSON: -- Exhibit 13 [sic]?
14        THE WITNESS: Oh. 13? 13 or 16?
15        MR. FRANCE: No, no, no.
16        THE WITNESS: 13?
17        MR. JOHNSON: I misspoke with 16. Sorry.
18        THE WITNESS: Okay. I believe I have it.
19        MR. JOHNSON: You have Exhibit 16?
20        MR. FRANCE: No.
21        THE WITNESS: Yes, sir, that, too.
22   BY MR. JOHNSON:
23   Q.   Do you have 16, Ms. DeGrasse?
24   A.   I do.
25   Q.   What is Exhibit 16?

Case 8:20-bk-03563-RCT   Doc 202-2   Filed 05/10/21   Page 7 of 12
Case 8:20-bk-03563-RCT   Doc 161-2   Filed 12/03/20   Page 7 of 12
Case 8:20-bk-03563-RCT   Doc 160-2   Filed 12/02/20   Page 7 of 12

Gardenmasters of SW Florida, Inc. v.  
Performance Driven Landscaping Corp.

Joy DeGrasse  
April 16, 2020

**Page 21**

1 A. Exhibit 16 shows the amount of sod
2 replacement.
3 Q. And if I'm reading it correctly, it's for the
4 period of January 26, 2018 through August 12, 2018; is
5 that correct?
6 A. Correct.
7 Q. And that's on page 1 of Exhibit 16?
8 A. Correct.
9 Q. Is the compilation of page 1 of Exhibit 16 all
10 of the sod that PDL paid for between January 26, 2018 and
11 August 12, 2018?
12 A. Yes.
13 Q. Based on your earlier answers, my
14 understanding is that if I asked you about each of the
15 individual invoices and why the sod replacement was
16 necessary, my understanding is you would not have any
17 knowledge in that regard; is that correct?
18 A. That's correct.
19 Q. In other words, you never went out and looked
20 at any of the properties that are listed in Exhibit 16 to
21 ascertain why the sod died or why it needed to be
22 replaced, correct?
23 A. No. I would just get random photos that
24 they would send me. I mean, that was it. Yeah. I
25 didn't go out there and look.

**Page 22**

1 Q. Prior to the filing of this lawsuit, did PDL
2 make demand on Gardenmasters to pay any of the amounts
3 listed on page 1 of Exhibit 16 --
4 A. No.
5 Q. -- which is the listing of the sod?
6 A. No. I -- I mean, not -- not me
7 personally, to my knowledge. I don't know if there
8 was conversations between John DeGrasse -- I -- I
9 know there was conversations between John DeGrasse,
10 but that's all hearsay, so -- but no proof of that.
11 Q. Would it be accurate for me to understand that
12 you personally did not make demand on Gardenmasters for
13 any of the sums listed on page 1 of Exhibit 16, which is
14 a list of sod replacements?
15 A. No. I did not personally make any
16 demands.
17 Q. I think you mean to say that's correct. There
18 was a double negative in there.
19 A. Correct.
20 Q. When I use the term "back charge," do you know
21 what I mean?
22 A. Yes.
23 Q. Has PDL issued any back charges or deductions
24 against any of the invoices from Gardenmasters?
25 A. No, not until the lawsuit.

**Page 23**

1 (Plaintiff's Exhibit 12 was identified for
2 the record.)
3 BY MR. JOHNSON
4 Q. Could you turn to Exhibit 12?
5 A. Yes. I created this answer. I'm
6 familiar.
7 Q. Is that your signature appearing on page 3 of
8 Exhibit 12?
9 A. Yes.
10 Q. And is Exhibit 12 a correct copy of that
11 document? In other words, it has three pages and that's
12 the way it looked when you signed it?
13 A. Yes. (Witness indicated.)
14 Q. And I'm looking at the answer on page 2 of
15 Exhibit 12. Do you see that?
16 A. I do.
17 Q. The last sentence of your answer says, "Also,
18 I cannot quantify it, but according to the fertilization
19 reports, we were not getting the product we were paying
20 for as Plaintiff was diluting its product." Do you see
21 that language?
22 A. Yes. Correct.
23 Q. And do I correctly understand that as of
24 today's date, April 16, 2020, you are still not able to
25 quantify any monetary amount that you are claiming as a

**Page 24**

1 result of the alleged failure of Gardenmasters to
2 properly apply the product?
3 A. Yeah. We can only quantify the actual
4 business lost due to lack of fertilization.
5 Q. And when you say the "business lost," that's
6 the $47,375 that's referenced in this answer, correct?
7 A. That's the $80,000 of lost business. The
8 47,000 is the hard cost that it cost us to replace
9 the sod.
10 Q. Can we agree that the $80,000 damages are not
11 listed in your answer to Exhibit 1 -- excuse me. Can we
12 agree that the $80,000 damage amount is not referenced in
13 your answer to paragraph 1 of Exhibit 12?
14 A. Correct. It is not listed in this answer.
15 Q. And why not?
16 A. It's vaguely -- it's vaguely answered.
17 Shame on me. But, yeah, I vaguely answered it
18 because I can't quantify at this time. But according
19 to the fertilization reports, we were not getting the
20 product that we were paying for, that the Plaintiff
21 was diluting its product. I should have continued
22 that sentence. I should have added another sentence,
23 but I didn't.
24 Q. What is the relationship between the alleged
25 dilution of product by Gardenmasters and the $80,000 that

Case 8:20-bk-03563-RCT   Doc 202-2   Filed 05/10/21   Page 8 of 12
Case 8:20-bk-03563-RCT   Doc 161-2   Filed 12/03/20   Page 8 of 12
Case 8:20-bk-03563-RCT   Doc 160-2   Filed 12/02/20   Page 8 of 12

Gardenmasters of SW Florida, Inc. v.  
Performance Driven Landscaping Corp.

Joy DeGrasse  
April 16, 2020

### Page 25

1  you're claiming in this lawsuit?
2    A.  We knew that what was causing the grass to
3  die -- and mind you, I'm going by experts telling me,
4  because I'm not an expert, that is dead.
5        But according to the experts that told me
6  that the reason why the turf was dying and that why
7  all the customers were unhappy with weeds, et cetera,
8  et cetera was due to lack of fertilization and that
9  the products were being cut. And, like I said,
10 that's when I ordered the soil samples.
11       So we started losing business and we were
12 starting to spend money that wasn't normal. It
13 wasn't normal. That's why it was being brought to my
14 attention.
15   Q.  When you said, quote, experts told you, quote,
16 that the fertilization was not being done properly, who
17 are the experts you're referring to?
18   A.  I am referring to the irrigation people
19 that we had working for us at the time and -- what's
20 his name? I -- I don't know the names off the top of
21 my head. And then, of course, the soil sample report
22 that was done by a third party.
23   Q.  Are you able to tell me the names of the
24 people today?
25   A.  No. One of them was Josh Ward. One of

### Page 26

1  them was -- it's a weird name. The irrigation guy
2  that you were talking to John about.
3    Q.  I think it's Mr. Sterling?
4    A.  Yes. Thank you.
5        Those were two of them that I can name off
6  the top of my head. The other ones, I would have to
7  go look into their names.
8    Q.  Do I --
9    A.  But at the time I was kind of
10 disconnected. I was an absentee president.
11   Q.  Do I correctly understand that your background
12 and experience are such that you're not able to reach a
13 conclusion as to whether Gardenmasters was diluting its
14 product? That's something somebody else would have to
15 tell you?
16   A.  Correct.
17   Q.  And the people that you relied on to provide
18 you an opinion that Gardenmasters was diluting its
19 product were Josh Ward and Tabares Sterling?
20   A.  Yeah. Those were two of them. I have the
21 emails from all of those people, I have all of the
22 emails to support it, so I have to go back through
23 those emails from them directly with their findings.
24       (Plaintiff's Exhibit 13 was identified for
25 the record.)

### Page 27

1  BY MR. JOHNSON:
2    Q.  Could you turn to Exhibit 13, please?
3    A.  (The witness complied.)
4    Q.  Do you have the Exhibit 13, Mrs. DeGrasse?
5    A.  I do.
6    Q.  Is that your signature appearing on the last
7  page of Exhibit 13?
8    A.  It is.
9    Q.  And is Exhibit 13 a true and correct copy of
10 the Answers to Interrogatories that you provided on
11 April 10, 2020?
12   A.  Hold on. I'm making sure Michael France
13 didn't change anything. Yeah. I mean, this is
14 pretty much just like the other exhibit. So, yes,
15 it's correct.
16   Q.  What do you anticipate will be the testimony
17 of CLC Labs at the trial in this case?
18   A.  I have no idea. I clearly have a report.
19   Q.  And when you say you have a report, that's
20 Exhibit 18, correct, which is the series of testing?
21   A.  That's it. Yeah.
22       (Plaintiff's Exhibit 18 was identified for
23 the record.)
24 BY MR. JOHNSON:
25   Q.  Could you go to Exhibit 18 while we're talking

### Page 28

1  about it?
2        MR. FRANCE: Before you ask her a
3  question, I'm going to use the restroom. I'll
4  be right back.
5        (Short break from 3:20 p.m. to 3:25 p.m.)
6        MR. JOHNSON: Can you hear me?
7        THE WITNESS: Yes. Michael's back.
8  BY MR. JOHNSON:
9    Q.  Do you have Exhibit 18 in front of you?
10   A.  I do.
11   Q.  Based on what you've told me about your
12 education, training, and experience, reading Exhibit 18
13 is not in your job description. Is that a correct
14 understanding for me?
15   A.  Not in my job description. I understand
16 surplus, high, adequate, and low, however.
17   Q.  Right. But in terms of how the environment
18 would affect potassium or magnesium or calcium, that
19 wouldn't be something you would normally understand,
20 correct, like me?
21   A.  Yeah. That's -- I -- I don't understand
22 that. Like I said, I'm going by people that do
23 understand that. I went by their opinion.
24   Q.  And besides Mr. Tabares Sterling and Mr. Josh
25 Ward, are there any other people that you can identify as

Case 8:20-bk-03563-RCT   Doc 202-2   Filed 05/10/21   Page 9 of 12
Case 8:20-bk-03563-RCT   Doc 161-2   Filed 12/03/20   Page 9 of 12
Case 8:20-bk-03563-RCT   Doc 160-2   Filed 12/02/20   Page 9 of 12

Gardenmasters of SW Florida, Inc. v.  
Performance Driven Landscaping Corp.

Joy DeGrasse  
April 16, 2020

**Page 29**

1  people who provided you an opinion that Gardenmasters had
2  diluted its product or otherwise wasn't properly
3  fertilized?
4  A.  John DeGrasse and hearsay.
5  Q.  Was Josh Ward a supervising employee of PDL?
6  A.  Pardon me? I couldn't hear you.
7  Q.  Did Josh Ward have supervisory responsibility
8  for PDL?
9  A.  He was -- yes. He -- he handled most of
10  the fertility.
11     (Plaintiff's Exhibit 14 was identified for
12  the record.)
13  BY MR. JOHNSON:
14  Q.  Could you turn to Exhibit 14 for me?
15  A.  (The witness complied.)
16  Q.  Just one second. Do you have Exhibit 13, Ms.
17  DeGrasse?
18  A.  Yes, I do. 13 or 14?
19  Q.  Do you have Exhibit 14?
20  A.  I do, yes, sir.
21  Q.  Why weren't Mr. Sterling and Mr. Ward listed
22  in your answers contained in Exhibit 14?
23  A.  Definitely an oversight on my part. I
24  don't know why, actually. That's a very good
25  question. It's a question I can't answer, sir. I

**Page 30**

1  did these in September.
2     MR. FRANCE: I'm not allowed to talk to
3  you.
4     THE WITNESS: Yeah. Don't talk to me.
5  You're going to get yourself in trouble.
6  A.  Honestly, I didn't read it. Didn't read
7  it.
8  Q.  Ms. DeGrasse, I want to do a little math, and
9  you're welcome to check me or you can take my word for
10  it.
11  A.  Okay.
12  Q.  The amount that Gardenmasters has invoiced PDL
13  is $421,492.72.
14  A.  Correct.
15  Q.  PDL has claimed an offset for $47,375 for sod,
16  correct?
17  A.  Correct.
18  Q.  And you're also claiming an offset for an
19  $80,000 loss of business, correct?
20  A.  Correct.
21  Q.  If you deduct $47,375 and $80,000 from the
22  amount that's been invoiced by Gardenmasters, it results
23  in $294,117.72.
24  A.  That's correct.
25  Q.  Are you agreeable to that?

**Page 31**

1  A.  That's correct.
2  Q.  Why has PDL not paid Gardenmasters
3  $294,117.72, which is the undisputed amount due?
4  A.  Because it went into litigation.
5  Q.  Have you spoken with John Lienaweaver about
6  this case?
7  A.  I have never spoken to John Lienaweaver in
8  my life.
9  Q.  Have you spoken with Brian Williams about this
10  lawsuit?
11  A.  No.
12  Q.  Have you spoken with Michael Story about this
13  lawsuit?
14  A.  No.
15  Q.  What is PKN Farms?
16  A.  PKN Farms is a subcorporation for all of
17  -- any of our subs. So anybody that comes in as a
18  subcontractor, whether it be a tree service --
19  anybody that's a sub and that is not a permanent
20  employee is PKN Corporation.
21  Q.  What, if anything, is your involvement in the
22  area of irrigation on behalf of PDL?
23  A.  Zero. Other than the numbers and telling
24  people what hours they've got, at this point, what
25  hours they've got to stay in, that's -- that's my

**Page 32**

1  involvement, is on the administrative side right now
2  and just the numbers.
3  Q.  Who owns PKN Farms, by the way?
4  A.  It's my accountant created that
5  corporation, so it's not even owned by us.
6  Q.  What's the name of your accountant?
7  A.  Beth Wilson.
8  Q.  I missed the first name.
9  A.  Tax Savers. Beth Wilson.
10  Q.  I'm looking at my notes. Give me just a
11  second.
12  A.  No problem. Take your time. I have
13  nowhere to be until 5 o'clock. Now, Michael France
14  probably has someplace to be.
15     MR. FRANCE: No. I'm boring.
16     (Plaintiff's Exhibit 2 was identified for
17  the record.)
18  BY MR. JOHNSON:
19  Q.  Could you go to Exhibit 2, Ms. DeGrasse?
20  A.  Okay.
21  Q.  Have you ever seen Exhibit 2 before?
22  A.  I'm sure I have because everything gets
23  sent to me, so I'm sure -- I'm sure I have. I'm sure
24  I actually helped answer this.
25     (Plaintiff's Exhibit 5 was identified for

Case 8:20-bk-03563-RCT   Doc 202-2   Filed 05/10/21   Page 10 of 12
Case 8:20-bk-03563-RCT   Doc 161-2   Filed 12/03/20   Page 10 of 12
Case 8:20-bk-03563-RCT   Doc 160-2   Filed 12/02/20   Page 10 of 12

Gardenmasters of SW Florida, Inc. v.  
Performance Driven Landscaping Corp.

Joy DeGrasse  
April 16, 2020

### Page 33

1  the record.)
2  BY MR. JOHNSON:
3    Q.  Would you turn to Exhibit 5, please?
4    A.  Yes. I'm very familiar with this one.
5    Q.  How are you very familiar with Exhibit 5,
6  which is the letter dated November 5, 2018?
7    A.  Because I'm the one that initially made
8  contact with Michael France and had this letter drawn
9  up.
10   Q.  And did you see a copy of Exhibit 5 at about
11 the time it was sent out?
12   A.  Yes.
13   Q.  And when Mr. France wrote that, quote, Some
14 monies are owed your company, quote, and sent that to
15 Gardenmasters, how much money did you think was owed to
16 Gardenmasters at the time?
17   A.  I honestly at that time didn't know.
18   Q.  And what --
19   A.  I wasn't involved in the accounting that
20 deep at that time.
21   Q.  During what period of time have you been
22 involved, if at all, deeply in the accounting of PDL?
23   A.  Deeply, the past two months. And then in
24 '13, '14, '15, and most of '16, then I stopped for a
25 while, and then I've been back involved since

### Page 34

1  February.
2       (Plaintiff's Exhibit 6 was identified for
3    the record.)
4  BY MR. JOHNSON:
5    Q.  Would you take a look at Exhibit 6, please?
6    A.  Yes.
7       (Discussion off the record.)
8    A.  Okay. Yes. I'm sorry. Yeah.
9    Q.  Have you seen Exhibit 6 before?
10   A.  No. I have not seen it, but I was aware
11 of it. I had heard about it, but I -- I had never
12 seen it.
13   Q.  What, if any, role did you play in maintaining
14 the relationships between PDL and its customers?
15   A.  I don't play any role in maintaining the
16 relationships. That is 100 percent John DeGrasse.
17   Q.  So, in other words, you don't speak with Kim
18 Bittar or Brian Rivenbark?
19   A.  No. The only person I know is Pat Neal.
20 I talk to him, but that's because we're friends.
21 But, no.
22   Q.  I think we had a double negative in there. Do
23 I correctly understand that you do not communicate with
24 people like Kim Bittar or Brian Rivenbark?
25   A.  Correct. I don't even know who that is.

### Page 35

1  Brian Rivenbark.
2    Q.  You mentioned that you do sometimes
3  communicate directly with Pat Neal?
4    A.  Correct.
5    Q.  Have you ever had any communications with Pat
6  Neal regarding Gardenmasters?
7    A.  No.
8    Q.  Why not?
9    A.  I have no reason to.
10   Q.  Have you ever told anybody that PDL has
11 resolved matters with Gardenmasters?
12   A.  No. That would be a lie.
13   Q.  I think I know the answer to this one, but do
14 I correctly understand that you're not able to identify
15 any damages as a result of Exhibit 6 or 7 being sent to
16 Mr. Rivenbark and Ms. Bittar?
17   A.  Correct. You are correct.
18      (Plaintiff's Exhibits 9 and 10 were
19   identified for the record.)
20 BY MR. JOHNSON:
21   Q.  Would you take a look at Exhibits 9 and 10?
22   A.  Okay. I got it.
23   Q.  What are Exhibits 9 and 10?
24   A.  This is the format that Gardenmasters used
25 to do when we would consummate our contracts with

### Page 36

1  them.
2    Q.  And it looks like ---
3    A.  I never looked at them or signed them, so
4  I can't really even -- really can't help you with
5  much of this -- these two things.
6    Q.  Is it fair for me to understand that these
7  were the underlying documents that gave rise to the
8  invoices that Gardenmasters ultimately sent you?
9    A.  Yes. Yeah. Yes.
10   Q.  And do I correctly understand that
11 Gardenmasters billed you the $421,492 based on Exhibits 9
12 and 10?
13   A.  Yes.
14      MR. JOHNSON: Mr. France, do I correctly
15   understand Ms. DeGrasse is being produced as the
16   corporate representative today?
17      MR. FRANCE: Yes. And let me ask you a
18   question because I do not have the notice in
19   front of me. You know, I don't want to parse
20   corporate representatives, but she's testifying
21   as the corporate representative to every single
22   monetary question you've asked.
23      If there are any questions about what
24   happened out in the field, that would be -- I
25   would say John DeGrasse would be the person with

Case 8:20-bk-03563-RCT   Doc 202-2   Filed 05/10/21   Page 11 of 12
Case 8:20-bk-03563-RCT   Doc 161-2   Filed 12/03/20   Page 11 of 12
Case 8:20-bk-03563-RCT   Doc 160-2   Filed 12/02/20   Page 11 of 12

Gardenmasters of SW Florida, Inc. v. Performance Driven Landscaping Corp.

Joy DeGrasse
April 16, 2020

**Page 37**

1  the most knowledge about those.
2      THE WITNESS: Correct.
3      MR. FRANCE: If you need me to drill down
4  with more detail, I'd be happy to. But, between
5  the two of them, that's it.
6      MR. JOHNSON: Well, I'm assuming anything
7  they testify to they had authority to testify to
8  on behalf of the company then, is what you're
9  telling me.
10     THE WITNESS: Yeah.
11     MR. FRANCE: And when he said, "I'm not in
12 admin," yes. She's the admin. And I think her
13 testimony was a lot definitive in that regard.
14 I think, you know, that's pretty obvious. And
15 then with this talk about fertilizer, that's
16 him, and it's clearly not her.
17     MR. JOHNSON: Well, if I understand
18 correctly, they're both the corporate
19 representatives for the matters within their
20 purview and as to what they testified to.
21     MR. FRANCE: Yes. That's correct.
22     THE WITNESS: Correct.
23     MR. FRANCE: You said it better than I
24 did.
25     MR. JOHNSON: Let me ask my client a

**Page 38**

1  question. Just give me a second.
2      THE WITNESS: Okay.
3      (Discussion off the record.)
4      MR. JOHNSON: Michael, why don't we take a
5  five-minute break, if that's okay. I want to
6  chat with my client for a second.
7      MR. FRANCE: That's fine. That's fine.
8      THE WITNESS: Perfect.
9      MR. FRANCE: We'll put you on mute and
10 talk in a second.
11     (Short break from 3:40 p.m. to 3:50 p.m.)
12     MR. JOHNSON: I don't have any more
13 questions for Ms. DeGrasse.
14     THE WITNESS: Okay. Well, it was nice
15 chatting with you guys.
16     MR. JOHNSON: Nice chatting with you.
17 Michael J. was going to say bye to you, if that
18 won't offend you.
19     THE WITNESS: Not at all.
20     (The deposition concluded at 3:50 p.m.)
21
22
23
24
25

**Page 39**

1           CERTIFICATE OF OATH
2
3  STATE OF FLORIDA
4  COUNTY OF SARASOTA
5
6      I, JENNIFER D. DILORENZO, the undersigned
7  authority, certify that JOY DEGRASSE appeared before
8  me by video teleconference on April 16, 2020, at 2:50
9  p.m. and was duly sworn.
10     WITNESS my hand and official seal this 25th
11 day of April, 2020.
12
13
14
15
16
17
18
19
20                    _____
                      JENNIFER D. DILORENZO
21                 Notary Public - State of Florida
22                 My Commission No. GG 957001
                      Expires: March 7, 2024
23
24 Personally Known: No
   Produced Identification: Yes
25 Type of ID Produced: Florida driver's license



**Page 40**

1          CERTIFICATE OF REPORTER
2  STATE OF FLORIDA
3  COUNTY OF SARASOTA
4
5      I, JENNIFER D. DILORENZO, Shorthand
6  Reporter, hereby certify that I was authorized to and
7  did stenographically report the deposition of JOY
8  DEGRASSE; that a review of the transcript was not
9  waived; and that the foregoing transcript, pages 4
10 through 38 is a true and complete record of my
11 stenographic notes.
12     I FURTHER CERTIFY that I am not a relative,
13 employee, or attorney, or counsel of any of the
14 parties' attorney or counsel connected with the
15 action, nor am I financially interested in the action.
16     Dated this 25th day of April, 2020,
17 Sarasota County, Florida.
18
19
20
21
22                    _____
23
24                    JENNIFER D. DILORENZO
25                    COURT REPORTER

Case 8:20-bk-03563-RCT   Doc 202-2   Filed 05/10/21   Page 12 of 12
Case 8:20-bk-03563-RCT   Doc 161-2   Filed 12/03/20   Page 12 of 12
Case 8:20-bk-03563-RCT   Doc 160-2   Filed 12/02/20   Page 12 of 12

Gardenmasters of SW Florida, Inc. v.  
Performance Driven Landscaping Corp.

Joy DeGrasse  
April 16, 2020

---

**Page 41**

```
 1            ERRATA SHEET
 2   DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 3   RE:       Gardenmasters vs PDL
     CASE No.: 2018CA6432NC
 4   DEPONENT: Joy DeGrasse
     DATE:     April 16, 2020
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   Page No.  Line No.   Change          Reason
15   Under the penalties of perjury, I declare that I have
     read the foregoing document and that the facts stated
16   in it are true.
17   _____     _____
     DATE                 JOY DEGRASSE
18
19
20   ORIGINAL: Charles Johnson, Esq.,
               cjohnson@blalockwalters.com
21
     COPY:    Michael France, Esq.,
22            kbang@mfrancelaw.com
23
24
25
```

**Page 42**

```
 1   April 29, 2020
 2   Joy DeGrasse
     c/o Michael France, Esq.
 3   Michael France, P.A.
     1515 Ringling Blvd., Suite 800
 4   Sarasota, FL 34236
     kdbang@mfrancelaw.com
 5
     In Re: Deposition of JOHN DEGRASSE taken on 4/16/20
 6          Gardenmasters vs PDL
 7   Dear Sir:
 8   This letter is to advise that the transcript for the
     above-referenced deposition has been completed and is
 9   available for review. Please have your client contact
     Imperial Court Reporting at (941)260-9000 to make
10   arrangements to read and sign the transcript at our
     office within 30 days from the date of this letter;
11   otherwise, they may sign below to waive review of this
     transcript and email this page to the email address
12   below.
13   In the alternative, if you have ordered a copy of the
     transcript and will be handling reading and signing,
14   have your client note any corrections on the errata
     sheet provided and email it to
15   admin@imperialcourtreporting.com to be forwarded to
     all parties for inclusion in the transcript.
16
17                           Sincerely,
18
19                           Imperial Court Reporting
20   cc: Charles Johnson, Esq.,
         cjohnson@blalockwalters.com
21
22   Waiver:
23   I,_____, hereby waive the reading and
     signing of my deposition transcript.
24
25   _____      _____
     Deponent Signature            Date
```